## Carter *et al. versus* Philadelphia Coal Co.

1. A coal company, indebted to defendants, engaged them to sell their coal; defendants employed brokers to sell for them; in settlement with the company, they charged commissions paid the brokers; in a suit by the company to recover back the commissions, evidence was proper that it was usual and customary in the Philadelphia coal trade, where the business was transacted, to sell through the agency of brokers.

2. "Usual and customary," imports such a fixed and established usage as to be declared general by the trade.

3. Usages of a particular trade are presumed to be known to those engaged in it; they are supposed to have entered into the contract.

January 8th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the District Court of *Philadelphia :* No. 166, to January Term 1873.

This was an action of assumpsit, brought January 25th 1871, by the Philadelphia Coal Company against William T. Carter and Charles F. Schoener, partners as William T. Carter & Co.

Prior to 1867 the firm of G. W. Huntzinger & Co., consisting of G. W. Huntzinger and Harry L. Cake, were mining and shipping coal from Girard lands, in Schuylkill county, leased by them. In 1867, this firm was incorporated as the Philadelphia Coal Company : Cake becoming president, Huntzinger, treasurer, and George C. Mitchell, secretary; the company consisted of five directors. Huntzinger & Co. and the plaintiffs, who were coal miners and shippers, before and after the incorporation had had business transactions with the defendants, and as the result of these transactions, on the 1st of July 1867, they owed defendants $60,000.

In November 1867, by arrangement, the defendants became directors in the corporation ; Cake, Huntzinger and D. B. Brown, three of the old directors, being continued in the direction. Carter was chosen president, and continued president for about two years. The defendants sold coal for the company to the Philadelphia & Reading Railroad Company, and in doing so, employed Shoemaker & McIntyre, coal brokers, and paid them commissions, which they charged to plaintiffs and settled their transactions with them November 20th 1868. This suit was brought to recover back these commissions from the defendants.

The plaintiffs gave evidence by G. W. Huntzinger, that the "Carter party," were in the minority in the board of directors. The whole stock of the company was $350,000, and $200,000 were transferred to the defendants as collateral security for the debt of Huntzinger & Co. due to them ; the indebtedness in 1868 amounted to $100,000. In November 1868, the plaintiffs settled finally with defendants, who accepted from them notes which they held, and their own notes at long dates, in payment.

The stock was retransferred to plaintiffs as the debt was paid off; the first complaint as to the commissions was in November or December 1868. The accounts with defendants were kept in the books of the plaintiffs by G. W. Mitchell, the secretary.

On re-examination of witness, the plaintiffs proposed to ask him when and why Mitchell was removed from the secretaryship. Defendants objected to the question; it was admitted and a bill of exceptions sealed.

The witness said, "Mitchell was removed on the 6th of November 1868, because we could no longer live under this rule of William T. Carter & Co."

H. L. Cake testified that he first had knowledge of the charge of the commissions in July 1868; he had never examined the books of the plaintiffs. On November 4th 1868, he found that Mitchell had made the entry allowing commissions to defendants for sales as made by Shoemaker & McIntyre, which witness himself had made to the railroad company. Witness received orders from that company every month for coal.

The president of the railroad company, testified that they had made no purchase through Shoemaker & McIntyre.

There was other evidence in support of their case.

For the defendants, Carter testified that during his presidency of the company the accounts were regularly entered, and that he gave the secretary no special instructions about entering the accounts. Huntzinger always had access to the books; all the money paid Shoemaker & McIntyre was earned by them; "commissions" was the only item objected to at the settlements; witness proposed to Cake to carry a balance of $30,000 or $40,000, for from three to fifteen months, and Cake said in consideration of that offer he withdrew all objection to the commissions and settled in full; the defendants had a controlling vote at the stockholders' meetings.

The defendants then offered to show by a miner and shipper of coal that during the years from 1867 to 1871 inclusive, "it had been the usual and customary method of the Philadelphia coal trade, to sell their coal through the agency of brokers, to the railroad company, to whom a commission was paid; that witness sold largely to the Reading Railroad Company, through Shoemaker & McIntyre, and that the sales so effected, could not have been effected in any other way."

The offer was objected to, rejected and a bill of exceptions sealed for defendants.

The defendants gave evidence of the manner in which they had conducted their agency in selling coal for plaintiffs, and in keeping their accounts; that Huntzinger agreed to the propriety of selling the coal through Shoemaker & McIntyre; that he said it was

[Carter *v.* Philadelphia Coal Co.]

better to pay them commission than have coal sold by them for other persons.

Henry F. Shoemaker, of the firm of Shoemaker & McIntyre, testified that his firm had an order from the Philadelphia & Reading Railroad Company to buy coal; that it was desirable to sell coal to that company; the firm agreed with Carter & Huntzinger, who represented the plaintiffs, to sell all plaintiffs' coal for 15 cents per ton; but for this arrangement the plaintiffs' collieries would have been idle.

Carter was again called, and defendants offered to show by him that coal could not be sold except to the Philadelphia & Reading Railroad Company. This was rejected, after objection by the plaintiffs, and a bill of exceptions was sealed.

There was evidence tending to show that the principal amount of coal sold by the plaintiffs was to the Philadelphia & Reading Railroad Company.

At the final settlement, a receipt was given as follows:—

"Received, Phila., Nov. 20th 1868, of Messers. G. W. Huntzinger & Co., their two acceptances of H. L. Cake's drafts, as follows : One dated November 30th 1868, 4 months after date, for $10,000, the other dated November 20th 1868, for $5809.22 ; also check No. 2406, on First National Bank, for $14,000, *being* the balance *due us, as per settlement made this day.*

"W. T. CARTER & Co.

"$10,000.00
    5,809.23
  14,000.00
———————
 $29,809.23"

The court (Mitchell, J.) charged :—

"This is an action to recover back commissions alleged to be improperly contained in accounts between the parties.

"The plaintiffs' case is that the commissions were not earned by Shoemaker & McIntyre ; sales having in fact been made by Cake, and coal taken from the car by the Reading Railroad Company ; and that the charges are inserted in the defendants' accounts in violation of duty and good faith. The defence is :—

"1. That the commissions were earned by Shoemaker & McIntyre. That they were paid in good faith by defendants to Shoemaker & McIntyre. That the commissions were moderate. That sales could not have been otherwise made.

"2. That plaintiffs knew of the payment of these commissions, and acquiesced therein at the time.

"3. That any objections that may have been subsequently raised thereto, were abandoned in November 1868, at the final settlement.

"[The defendants held a large majority of the stock ; therefore,

the control of the company was entirely in their hands.] They were bound to strict and peculiar fidelity.

" The defendants, Wm. T. Carter & Co., were composed of the president and one director of the plaintiffs' company, and their accounts were entered and passed by themselves. The jury, therefore, will examine closely these accounts, as the parties were under special obligations to good faith and careful dealing.

" The plaintiffs' company were, in fact, G. W. Huntzinger & Co. The evidence is that Huntzinger & Co. owned the stock and handed it over as collateral, and on payment of their debt it was returned to them. While therefore Carter, as president, and Schoener, as director, were bound to conduct the affairs of the company with good faith, and to show this in the clearest manner in their dealings with themselves as Wm. T. Carter & Co., yet they had a right to treat G. W. Huntzinger & Co. as the coal company ; and if G. W. Huntzinger & Co. were satisfied with the management and with the things that were done, Carter & Co. were not bound to look for a more formal approval by the coal company as such.

" 1. The first question for your consideration is, whether these sales were made by Shoemaker & McIntyre ? * * *

" 4. If Huntzinger & Co. knew of the payment of these commissions and acquiesced in them, they would be bound. Upon this point you have the testimony of these parties, and also of Mr. Shoemaker and Mr. Mitchell, and the fact of the entries on the company's book, to which Mr. Huntzinger, at least, always had access." * * *

The verdict was for the plaintiff for $2000.

The defendants took a writ of error, they assigned for error :—

1. Allowing the plaintiffs to give evidence why Mitchell, secretary of the company, was removed.

3. Refusing to allow the defendants to prove that it was the custom of the Philadelphia coal trade to sell by the agency of brokers.

5. Refusing to allow defendants to prove that the plaintiffs' coal could not have been sold to the railroad company except through Shoemaker & McIntyre.

7. The part of the charge in brackets.

*M. J. Micheson* and *T. Cuyler*, for plaintiffs in error.—As to the first assignment : it was not proper to introduce new matter on re-examination : 1 Starkie on Ev., sects 231, 467 and note. The Queen's Case, 2 Brod. & Bing. 297. The evidence being irrelevant should not have been submitted to the jury : Kendall *v.* Lee, 2 Penna. R. 488 ; Kocher *v.* Bowman, 10 Watts 128 ; Bratton *v.* Mitchell, 3 Barr 44 ; Stevenson *v.* Stewart, 1 Jones 308. As to the third and fifth assignments : they cited Fleet *v.* Murton, Law Rep. 7 Q. B. 130. There being a known custom in the coal trade,

27 P. F. SMITH—19

[Carter *v.* Philadelphia Coal Co..]

evidence might be given in relation to it, although not expressed in the contract: 1 Starkie on Ev., sect. 710 ; Webb *v.* Plummer, 2 B. & Ald. 746 ; Roberts *v.* Barker, 1 C. & M. 808 ; Hughes *v.* Gordon, 1 Bligh. 287 ; Clinan *v.* Cooke, 1 Sch. & Lef. 22.

*G. M. Dallas,* for defendants in error.

Mr. Justice MERCUR delivered the opinion of the court, March 22d 1875.

This was a suit to recover back certain commissions, claimed by, and allowed to, the plaintiffs in error on a previous settlement between the parties. It was a settlement of the business enterprise, generally, in which the parties were jointly interested ; and also of the particular transaction in which the plaintiff in error claimed to have paid the commissions. On that settlement the defendant in error was found to be indebted in a sum exceeding $20,000. At this time the defendant paid a portion of the sum in which it was found to be indebted, and gave drafts for the residue, payable in a few months thereafter. More than two years after the settlement, and after the payment of the drafts, this suit was brought. On the trial the objection does not appear to have been taken that the settlement could be overthrown only on proof of fraud, mistake or ignorance of legal rights in making it; but the merits of the claim, made by the plaintiffs in error for the commissions, were inquired into, as if no settlement thereof had previously been made. The actual payment of the commissions by the plaintiffs in error was not strongly questioned; but whether they had been paid in good faith, or in a heedless and improvident manner, was the contention. They had been paid to Shoemaker & McIntyre, who were coal brokers. The plaintiffs in error sought to prove a faithful and careful performance of their agency. In furtherance of this object it was clearly evidence of good faith and prudence for them to show that they had sold according "to the usual and customary method of the Philadelphia coal trade," and that such method was to sell "through the agency of brokers, to whom a commission was paid." It was here the office of the parties was kept and their business transacted. It is urged that the offer is insufficient, inasmuch as it does not propose to prove a usage based upon a custom "which was established, uniform and general." It is true the offer is not in these precise words, yet we think the language imports substantially the same meaning. "Usual and customary" clearly import something more than casual or exceptional cases. They indicate such a fixed and established usage as to be declared general by the trade. Besides, it is not necessary to prove all the elements of a custom necessary to make a law; the object here is to interpret a contract. The usages of a particular trade or business are presumed to be known to those engaged

[*Carter v. Philadelphia Coal Co.*]

therein.   These may, therefore, in the absence of any express stipulation inconsistent therewith, be supposed to have entered into the understanding of the parties in making the contract.   They furnish a most valuable aid in arriving at the mutual assent of the parties, and when not contrary to law are admissible in evidence: Lewis *v.* Marshall, 7 M. & G. 744; United States *v.* Duval, 1 Gilpin 372; 2 Greenl. Evid., § 251; Finness *v.* Howe, 8 Wend. 247; Outwater *v.* Nelson, 20 Barb. 29; Girard Fire and Marine Insurance Co. *v.* Stephenson, 1 Wright 293; Helme *v.* The Philadelphia Life Insurance Co., 11 P. F. Smith 107 ; McMasters *v.* The Pennsylvania Railroad Co., 19 Id. 374.   The evidence shows the Reading Railroad Company purchased the largest quantity of the coal.   Such a purchaser may well have been considered very desirable.   If so, it was certainly pertinent to show that those sales could only be made through Shoemaker & McIntyre.   We think, therefore, the evidence covered by the third and fifth assignments should have been received.   The seventh assignment is to that portion of the charge of the court wherein it is said, " the defendants held a large majority of the stock of the company, *therefore*, the control of the company was entirely in their hands."   It is true Carter & Co. did hold a majority of the stock, but they had accepted it under an arrangement by which they were to have a minority of the directors.   The board consisted of five directors. Carter & Co. were to have, and in fact did have, only two of them. All the coal in question was sold within one year.   No change of directors was made within that time.   The controlling management was therefore in the other three directors.   Under the circumstances, and for the time in question, a majority of the stock did not put " the control of the company entirely in the hands of Carter & Co.," and, in so charging, the learned judge erred.

Inasmuch as the reason given for the removal of the secretary was not made known to the plaintiffs in error, they ought not to be affected thereby.   It therefore follows that the evidence covered by the first assignment ought not to have been received.

Judgment reversed and a *venire facias de novo* awarded.